Bank of Rome *v.* Haselton.

BANK OF ROME *et al. v.* J. C. HASELTON *et al.*

1. CHANCERY PRACTICE. *General creditors' bill.* Several creditors of an insolvent firm of non-resident partners, doing business in Tennessee, may unite in filing a general creditors' bill on behalf of themselves and all other creditors, who will make themselves parties thereto, and, if the debtors do not object, may, under attachment, impound all their property for the joint benefit of all creditors coming in under the bill; and creditors impeaching the proceeding cannot participate in its benefits.

2. SAME. *Same.* It is not a fatal objection to such a proceeding, that no order was made that it should stand as a general creditors' bill, and publication be made accordingly, for all creditors to come in under it.

3. SAME. *Attachment. Impeachment by other creditors. Semble* that a subsequent attaching creditor may impeach an attachment for defects on its face; and also, where the debtor and attaching creditor reside in the same foreign State, though this fact is not apparent in the proceeding.

4. MORTGAGE OF MERCHANDISE. *When void.* A mortgage of merchandise is fraudulent and void if it appear, either on the face of it or by other proof, either direct or circumstantial, that it was the intention at the making of it, that the mortgagor should keep possession with the right and power of disposing of the mortgaged goods.

5. WAREHOUSE RECEIPTS. *Act of Assembly.* The warehouse act of 1879 is not in violation of Section 17, Article II, of the Constitution.

Bank of Rome *v.* Haselton.

6. SAME. *Effect of.* Warehouse receipts, issued in accordance with said act, are negotiable, and vest the holder with title to the property described in them.

7. SAME. *Description of property.* A warehouse receipt which describes the property as "50,000 pounds of bar iron, assorted, made at the Vulcan Works" is sufficient, though the property is stored in mass with other property of the same kind, so as not to be susceptible of identification by mark or otherwise.

8. SAME. *Possession of warehouseman.* It is not fatal to the receipt that the property was in the warehouse of the manufacturer (the pledgeor), *provided* that a regular warehouseman have the same rented, and the actual, exclusive custody of the same.

9. SAME. *Loan and exchange of property.* Nor is it fatal to the receipt that the warehouseman lent the pledgeor property covered by a receipt, on his promise to return a like quantity of similar kind, *provided* the same is returned and stored before it is seized by an attaching creditor.

10. ASSIGNMENT. *Notice to agent.* A notice in this State to a resident purchasing agent of a foreign railroad corporation that the debt due on one of his purchases has been assigned, is a sufficient notice to the corporation to perfect an assignment.

---

FROM HAMILTON.

---

Appeal from the Chancery Court at Chattanooga. W. M. BRADFORD, Ch.

BARTON & SON, WHEELER & MARSHALL and CLIFT & BATES for complainants in general creditors' bill.

KEY & RICHMOND and J. A. CALDWELL for Ward & Hamill and others, attacking creditors.

J. B. & T. H. COOKE for Lowe and others.

TOM. FORT for Wason Car & Foundry Company and others.

DODSON & MOON for Weihl.

J. J. McGLOHON for Musgrove.

INGERSOLL, Sp. J., delivered the opinion of the court.

Within these ten consolidated causes are contained the controversies of about one hundred creditors for priority of satisfaction of their respective demands out of the assets pledged, mortgaged and unencumbered of an insolvent firm of iron-makers. The record presents many questions of substantive law and of procedure, involving the constitutionality of statutes, the validity of mortgages, attachments and pledges, powers and duties of warehousemen, the character and effect of warehouse receipts, and the rights of holders thereof, the nature and requisites of a general creditors' bill, and the course of proceeding thereunder, the understanding of which requires a full statement of the circumstances of the case and an outline of the progress of a very complex proceeding.

In 1877, Haselton & Harris, both then residents of New Jersey, began as partners to operate the "Vulcan Works" at Chattanooga for the manufacture of iron, nails, etc. The business was carried on till May 28, 1880, when the firm failed, and under attachment bills filed in the chancery court at Chattanooga, their mills and property were all placed in the hands of a receiver. The two members of the firm had contributed each $30,000 to its capital. They had purchased the "Vulcan Works" on credit, and committed the entire supervision and control of their business to one Stone, as their attorney-in-fact and manager. He so conducted and managed the busi-

ness that at the end of the three years of operation
the firm had amassed an indebtedness of more than
$300,000, while their assets were about one-third of
that sum.    The failure is attributed to the shrink-
age in value of iron, and the great falling off in
sales of the product of their mills in 1880.

The conduct of the business included the purchase
of scrap-iron, pig-iron, coal, coke, etc., the puddling
and rolling of the iron, the manufacture of nails and
spikes, keeping a supply store, and the storing, sale
and shipment of the product of the mills and facto-
ries, and the other incidents of a large. iron manu-
facturing enterprise.    The firm was. probably insolvent
during the last year of its existence, but by energy
and a system of shrewd financiering, manager Stone
succeeded in keeping the large business in operation
and the firm's credit fair up to the day before the
failure, when the partners, on a visit to Chattanooga
and conference with him, determined that a longer
struggle to keep afloat would be unavailing, and con-
cluded, instead of making an assignment, to let their
business and creditors take care of themselves.. In
the week following May 27, 1880, these ten bills
were filed, and all the visible property of the firm
was seized for the benefit of the creditors.    J. C.
Warner and others had filed their bill on May 27
to attach certain property for their debts.    But as.
their priority is conceded, and the proceeds of their
sale were insufficient, to satisfy their debts, this suit.
need not be further noticed.

The leading bill in the consolidated causes is that.

filed by the Bank of Rome, Georgia, the Roane Iron Company, and the First National Bank of Chattanooga, on May 28. It shows an indebtedness of about $6,000 to the Bank of Rome, due and unpaid, and to the other two complainants of about $18,000, of which from $4,000 to $5,000 only, was matured; it alleges that the firm is insolvent, and that the members are non-residents of Tennessee, and reside in New Jersey, and on this ground prays for an attachment; because of their temporary presence in the State personal process is also asked against them; it is further alleged that the closing of the mills and factories would cause great hardship among the employes and their families, and therefore asks for the appointment of a temporary receiver to continue the operation of the mills and factories, as well for the benefit of the creditors as of the employes and the public. There is also a prayer that this bill "may be filed in behalf of themselves and all other creditors of the firm who may make themselves parties to this bill by petition in the nature of or as a general creditors' bill;" and that the attachment inure to the benefit of all such creditors; that their claims be adjudged, and the attached property sold for satisfaction, not only of the debts then due, but also of those thereafter to mature. Before filing the bill a *fiat* was obtained from the circuit judge for an attachment on a bond of $5,000, and also an order appointing J. C. Warner, on his giving bond in a like sum, receiver of the property. This temporary appointment, before even the filing of the bill, was

made, as the order recites, "in view of the particu-
lar nature of the case, and for the reasons assigned
in the bill." On the same day subpœna to answer
was issued. The defendants acknowledge, by their
solicitor, due and legal service of the same. The
attachment was duly levied on all the property of
Haselton & Harrison at the Vulcan Works, subject
to any prior valid legal lien; and the property was
turned over to the receiver. The officer did not in-
clude in this levy "a large lot of pig-iron, muck-
bar and manufactured iron" pointed out and claimed
by S. B. Lowe as his property.

No order was ever made that the bill be filed
or stand as a general creditors' bill, nor was any
order of publication made for creditors to appear and
file their claims in said cause. Yet on the very day
of the filing of the bill, other creditors began to
treat it as a general creditors' bill, and filed petitions
therein, asking the benefit of the proceeding, and in
the next twelve months no less than twelve petitions
were filed, embodying the claims of forty or more
creditors. One of these, filed on the day after the
filing of the bill, assumes the form of an answer
and cross-bill, contesting the demands of the com-
plainants, and setting up in favor of the employes
an alleged lien for labor on the product of the mills.
Of all these petitions only two—those of the Soddy
Coal Company and others and Musgrove and others—
pray for separate writs of attachment. Such writs
were issued and duly levied on the property of the
firm, so that these petitioners obtained a distinct status

in the case, differing from that of those petitioners who rely solely upon the general attachment sued out by the original complainants in the cause.

On May 31, 1880, some twenty creditors, declining to avail themselves of the offer in the "general creditors' bill," and accept the benefit of the attachment therein, filed a distinct bill under the style of Ward & Hamill and others against all the parties, complainant and defendant, to the leading bill, and also against one S. B. Lowe, an iron-factor and warehouse-man; in which, after reciting the allegations of said leading bill and the proceedings thereunder, they impeach the validity of the appointment of the receiver therein, because made in vacation, without notice or sufficient cause shown; they impeach also the validity of the attachment: First, as to the debts admitted to be not yet due, because the only ground alleged for attachment was the non-residence of the debtors. Second, as to the debt due the Bank of Rome, because the debtor, Hamilton, was not, as alleged in the bill, a resident of New Jersey, but was in fact a resident of Georgia, wherein also said bank had its residence, and it was not charged, as required by statute, that the property of said Harrison or the firm had been fraudulently removed to this State to evade legal process in Georgia. This bill also charges the firm with fraudulent conveyances of its property: First, in making a mortgage of merchandise and other chattels for the benefit of the First National Bank of Chattanooga, and retaining the possession and continuing the sale of the merchandise; second, in placing

in the hands of said Lowe hundreds of tons of nails, spikes and bar-iron fraudulently and for the purpose of hindering and delaying their creditors, which property Lowe was aiding them to cover up and conceal by claiming it for himself and others holding his warehouse receipts.   This claim of title by Lowe is attacked because his warehouses were at the " Vulcan Works," on the premises of Haselton & Harrison, and because, as alleged, his own debts are, many of them fictitious and fraudulent, his manner of obtaining possession of much of the property was fraudulent, his manner of holding it all was fraudulent; that without registered chattel mortgage he could not hold it; that his warehouse receipts were issued in violation of the statute requiring actual possession, and hence were invalid; and moreover, that the iron was all stored in bulk, so that the various lots could not be separated or identified. Wherefore, they pray for attachment to be levied on all the property in the receiver's hands, and all other property of the firm at the Vulcan Works, including that claimed by Lowe; and that Lowe be enjoined from disposing of any of said property; that they have judgment for their several debts and priority of satisfaction over the creditors in the leading bill.

Moross & Co. and others seek by their bill, filed June 1, to reach especially a debt due to the firm from the Alabama & Great Southern Railway, and for this purpose to set aside an alleged fraudulent and unauthorized assignment of the same by manager Stone to S. B. Lowe.

The Wason Car and Foundry Company and others file their bill June 3, containing, in addition to the allegations in the bill of Ward & Hamill, an allegation that Haselton & Harrison are in law residents of Tennessee, because of their large business operations here by a general agent, and hence all attachments sued out against them on the ground of non-residence are invalid; also, that many attaching creditors holding mortgages or collaterals have waived and released their security by filing bills without therein referring to the same; they insist that there is no such thing known to the laws of Tennessee as a "general creditors'" bill in a case like the present; that the warehouse receipts are in effect unregistered chattel mortgages, and invalid; that the "warehouse act" of 1879, chap. 236, is unconstitutional, and the receipts for this cause also are invalid; and also because the iron was not actually in Lowe's possession when they were given.

On the same day W. G. Lewis and others file a bill of substantially the same character.

Also on the same day the National Banks of Rome and of Cleveland unite in a bill, as an original bill, in the nature of a cross-bill, to the bill of Ward & Hamill and others, claiming title to certain quantities of the iron, nails and spikes attached by said bill, because of their holding the warehouse receipts of Lowe therefor, received by them as collateral for certain loans made by them to Haselton & Harrison solely on the faith of said receipts then assigned to them, and they ask to be allowed to reclaim their property.

Also on the same day Crutchfield & Co. file their bill attacking the chattel mortgage and the warehouse receipts as fraudulent and void, and attaching the property described and covered by these instruments, and also the debt due from the Alabama & Great Southern Railway, to secure their debt.

The other bills filed do not call for special mention.

July 8, 1880, an order was made consolidating these ten suits, wherein it was directed that the bills in the various causes should stand as answers in causes specified; and thus the issues were made up between the various creditors. The debtors failed to make defense, and *pro confesso* was entered against them.

An *instanter* report of the master, filed on the same day, showed that the debts for which attachments were levied on the property claimed by Lowe amounted to over $17,000; and on the following day Lowe was, by consent order, permitted to replevy the property on giving bond for the same in the penal sum of $17,000. This bond was executed on July 10, and this property was returned to the possession of Lowe.

The complainants in the leading bill, in their answers to the bills attacking their liens by attachment, insist that the objections taken therein to their attachment were solely matters of personal privilege to the debtors, as was likewise the appointment of the receiver; and that no one but the debtors could take advantage of irregularity therein.

In addition, the First National Bank of Chattanooga, while admitting that its trustee did not take possession

of the stock of goods at the date of the mortgage, protests its good faith and honest intention in taking the same, shows the validity of its debt, and excuses its delay in taking possession by the fact that the mortgage was not registered till the day before the failure.

The answer of Lowe, filed in the consolidated causes November 6, 1880, contains a full history and explicit statement of his dealings with the firm, a detailed account of their manner of doing business, showing how and why he had possession of so much of the product of the mills and factories; denies all fraud, and protests his ignorance of the insolvent condition of the firm till the day before its failure; insists that his claim to the chattels and *choses in action* is valid and upon a valuable consideration, and that he holds the iron, nails and spikes not only for his own security, but largely for the benefit of the holders of warehouse receipts given by him to manager Stone on deposit of the iron, nails, etc., and by Stone negotiated or hypothecated to banks and others for money advanced or lent to carry on the business; and exhibits statements of his own account with the firm, and also of his outstanding receipts, and the names of the holders thereof, so far as known to him. He admits that the bar-iron, nails and spikes were stored in warehouses, appurtenant to the mills and factories, with no sign upon them to indicate his separate possession, but says they were leased to him by manager Stone, and that he was the sole and exclusive occupant; that his clerk always carried the keys, and he had sole custody and control of the

property stored therein; and his possession was not concealed from any one. He also admits that the pig-iron and scrap-iron for use in the mills and factories was stored outside the warehouses in the yard around the works contiguous to the warehouses, but says it was nearly all marked, and all of it susceptible of identification by his clerk and manager Stone. He admits that on the night preceding the appointment of the receiver, as he is informed and believes, said Stone put about one hundred kegs of nails in the nail-house, but this was done without his knowledge or consent, and he never claimed these nails, nor gave any receipt therefor. His use of the warehouses and yard for the purpose of storage was because his own warehouse in the city was not commodious enough, and also for convenience and economy to save the expensive item of drayage, and enable him to store and handle the products of the "Vulcan Works" with facility and dispatch. He admits that the several deposits of iron for which his receipts were given were not kept separate, so that the exact iron for which each receipt was given could be identified and separated from the rest, but says the iron stored was "merchant bar iron" of various sizes; and as each lot was stored it was weighed and entered on the warehouse books, assorted by sizes, and each size placed by itself according to the recognized usage and custom of the trade; and there was always on hand the full quantity and same quality of iron called for in the warehouse receipts. The nails and spikes were also handled in like manner.

Only a small per cent. of the product of the mills and factories was stored with him, and this was such only as there was no order or immediate sale for; and when the firm had orders for sizes of iron not on hand, he had, in a few instances, lent to the manager from his warehouse small lots for a short time; but these amounts borrowed were always returned by the next day, but not always in the same sizes. He shows that he was a factor and commission merchant as well as a warehousemen, and sold iron for the firm, making weekly statements to them of account of sales, and paying first, after charges, the debt secured by the iron sold, and crediting surplus on his own claims, as factor and warehouseman, for the security of which all the iron stored was pledged to him; the decline in price of iron was so great that the iron stored was not enough to secure him, and on the day before the failure, in response to his demand, manager Stone delivered to him an additional amount of iron, bolts, spikes, etc., for his security as a pledge on his claims, which amount is specified and detailed in Ex. C to the answer. He says he did not learn of the insolvency of the firm till the day before the failure, and then his action was taken solely for the honest purpose of securing the payment of his *bona fide* debts. This answer of Lowe is on oath, and is corroborated by the deposition of Stone in most particulars, and must be taken as true, save in the few points when it is overcome by countervailing proof; and they do not materially affect his statement.

Of the many questions presented, the following are material to the case:

First. Is the bill of the Bank of Rome and others against Haselton and others to be maintained and treated as a general creditors' bill?

I was of opinion that the complainants did not show themselves to be creditors of any class permitted, either by the general rules of equity practice (1 Dan. Ch. Pr., 235–9), or by our statutes, to file a general creditors' bill, and impound all the property of the defendants for the benefit, not only of themselves, but also of such other creditors as might become parties thereto; that there is no recognized precedent for such a bill upon the facts alleged, and if the debtors had objected, it would have been fatal to the bill as a general creditors' bill; that other creditors are not estopped by the acquiescence of the debtors, since that would enable the debtors and certain creditors to thus in effect produce a general assignment by formal court proceeding, and avoid the restrictions placed by our statute around such assignments by deed, thus accomplishing by indirection what in regular and usual method is forbidden; and therefore that other creditors might by original bill impeach the proceedings as irregular and unauthorized, and thus defeat the bill as a general creditors' bill, and gain by their own separate attachment priority for themselves over parties who came in by petition without process under such bill, relying solely upon the original process for lien and security, and especially over such as came in after the filing of their

separate bill and the levy of their separate attachment.

A majority of the court incline to the view of Prof. Pomeroy (1 Eq. Jur., sec. 410), that a general creditors' bill may be filed to settle the affairs of an insolvent partnership or individual, as well as an insolvent corporation, as was permitted in the United States Circuit Court for Virginia in the recent case of *Fink* v. *Patterson.* But without so expressly ruling, they hold that this bill may be maintained as a general creditors' bill, because the debtors have submitted to it as such without objection, and allowed their affairs to be thus administered; that therefore the proceeding and lien cannot be impeached by the outstanding creditors; and moreover, that the general creditors' bill, with the assent of the debtors, operated to produce in effect a general assignment, and the outstanding creditors, by refusing to accept and by impeaching the same, debarred themselves of the right of participation in its benefits; and all such are therefore postponed to those creditors who did come in under the general creditors' bill, and accept the benefit of the attachments levied under it. And all the attachments issued under this bill, whether in pursuance of the prayer of the original bill, or on the subsequent petition or prayer of creditors who came in under it, inure to the joint benefit of all the creditors who became parties to said bill.

I was also of opinion that the failure of the court to make an order that this bill should stand as a general creditors' bill, and to direct publication for all

creditors to appear, was a weighty, and perhaps fatal, objection to this bill which the unwilling creditors might make by original bill, especially before any decrees were rendered in the case: 2 Dan. Ch. Pr., pages 1203–4. But the majority of the court hold that inasmuch as creditors generally appear to have accepted its offers, and come in under it without such order or publication, the defect in the proceeding is but an irregularity at most, and does not, on the attacks here made, vitiate the proceeding.

Second. The second question is whether these subsequent attaching creditors, standing out against the general creditors' bill, may impeach the validity of the attachments issued under that bill, either for defects apparent, or for matter to be shown *aliunde*, and may question the appointment of the receiver, the debtors themselves submitting to the same.

As to the matter of the receivership, since it has terminated and the funds are in court for distribution, the question is no longer a practical one, and does not therefore demand decision.

The attachment settled priority of right, and is therefore important. It was issued upon no other statutory ground than that of the non-residence of the debtors; yet by it complainants sought to secure debts not due. This was a fatal defect (new Code, sec. 4194), and it was apparent on the face of the proceedings.

It was alleged in the attacking bill, and shown by proof, that one of the debtors, Harrison, and one of the attaching creditors in the leading bill, the

Bank of Rome, were both citizens of Georgia. In such case our statute provides (new Code, sec. 4193) that "the creditor *shall not have attachment* against the property of his debtor unless he swear that the property of the debtor has been fraudulently removed to this State to evade the process of law in the State of their domicil or residence." No such oath was taken. The defect was fatal. It was not apparent on the face of the proceedings that the statute was violated; this was made to appear clearly in proof *aliunde*. I was of opinion that the attacking creditors might assail the attachment on both grounds, and gain whatever benefit would result from defeating them *pro tanto;* that even the consent of the debtor would not give validity to an attachment lien based upon proceedings which showed upon their face a fatal defect; and that another creditor might defeat the asserted lien, though the debtor had failed to make any defense; since, in a "race of diligence among creditors," the swiftest and most enduring can obtain no prize unless he has gone over the course marked out by law; and though he be first at the goal, he must yield the prize to a second who has conformed to law. I was also of opinion that the consent of a non-resident debtor to the attachment of a non-resident creditor from the same State, would not give validity to such writ when obtained in the face of the positive statutory inhibition; that this statute was one of public policy for the protection of home creditors, and the abatement of the attachment was not a matter of personal privilege to the debtor, but that

any other creditor might impeach such an attachment, and if the invalidity was not apparent on the face of the proceedings, he might show the facts, which would, under the law, defeat the attachment. And in these views a majority of the court were inclined to concur. But they hold that in this case the attacking creditors can gain no benefit from their assault, because, by upholding the leading bill as a general creditors' bill, validity has been given to the attachments therein issued, and thus a lien firmly fixed upon the property for the joint benefit of all creditors coming in under it, and not only for debts due, but also those not due, at the filing of the bill.

Third. Next to be considered is the deed of trust to Montague for the benefit of the First National Bank. Does it afford a valid security?

The entire instrument is as follows: " In consideration of the sum of five dollars to us paid, and for the purpose of securing a note dated this day, and made by us to the First National Bank of Chattanooga, due at thirty days, for the sum of $9,000, we do hereby sell, transfer and convey to T. G. Montague eleven mules, two horses, four wagons and harness, being the same mules, horses, wagons and harness now used by us in connection with the Vulcau Iron and Nail Works in Chattanooga; also all our merchandise now in store at said iron and nail works. If we pay said note at maturity this deed is to be void; but if we fail so to . do, then said Montague is authorized to take possession of said property and sell the same, or so much thereof as

may be necessary to pay said note, together with all the expense of executing this trust; the residue he shall pay to us or our order. Said trustee is authorized to make said sale in such manner and on such terms as he deems best for the interest of all parties. He may sell at public or private sale, for cash or on credit, and on such notice as his judgment may dictate. This, May 22, 1880. Haselton & Harrison."

It was proven May 27, 1880, and noted for registration at 2:30 P. M., same day. Haselton & Harrison remained in possession of the goods and chattels after, just as before, giving the deed, until May 28, when they were seized by the officer under the attachment, sued out in the leading case by the First National Bank and others to secure other indebtedness than that for which the mortgage was given. Montague was cashier of the bank, and familiar with the operations of Haselton & Harrison. Between the date of the deed and the seizure of the property, the debtors continued to use the chattels and to sell the goods, disposing of about $800 worth, chiefly to their own hands; and this without either the objection or the express assent of Montague. In the bill in the leading cause, which is sworn to by him, this mortgage is not mentioned; but it was evidently in mind in framing the prayer that the attachment be levied upon all the property of "Vulcan Works not already incumbered by valid liens." The $9,000 note represents a valid debt; and, so far as appears, the purpose of the parties in executing the mortgage was to secure the same, and not dishonestly to defraud

other creditors. The property embraced in it did not exceed in aggregate value the amount of the debt. The attack upon the security is based on other grounds, viz: First, that by the mortgage the debtors were to remain in possession of the merchandise with· liberty to carry on the business after, just as before, the deed. Second, that by the court proceedings the bank waived and abandoned the mortgage.

In *Bank* v. *Ebbert,* 9 Heis., 153, the mortgage contained an express reservation that the debtor, without bond, should keep possession of the stock of merchandise (liquors), and carry on the business, selling and buying just as before the deed, and the trustee should take possession only on default of payment of the note first due. For this reason the deed was declared void, because "although there was no specific intent to defraud any particular creditor, or no actual fraud in fact, yet there are such *facilities for fraud* contracted for on the face of the deed that it must be held wanting in legal good faith. * * * There is a benefit contracted for to the grantors on the face of the deed, and a prejudice to the rights of other creditors, in being able to keep their stock in trade covered up from execution, or attaching creditors, while they continued to use the same in defiance of their demands for profit, and with the means of appropriating the proceeds to their own use."

This case is disputed as a precedent for the present cause, since no benefit or facility for fraud is *contracted for on the face of this deed,* there being no special stipulation in it that the debtor shall remain in pos-

session and carry on the business of merchandising until the default. This distinction is obvious. Does it affect the result?

In the *Ebbert* case, the court, following *Twynne's* case, wherein the sale was held void, because the debtor "continued in possession of the goods and used them as his own; and some of them he sold; and he shore the sheep and marked them with his own mark," adhered to the old doctrine of liberal exposition and application of statutes "to prevent fraud, which doth so much abound in these days," and announced as the basis of decision in that case, "that any conveyance that puts the property of the debtor in the name of a third party, so far as the legal title goes, and leaves it in his possession, and under his control, with the right to continue to use it in trade, sell and dispose of it as before the conveyance, lacks the essential elements to sustain such a conveyance as against a creditor."

And in the well considered case of *Phelps* v. *Murray,* 2 Tenn. Ch. Rep., 746, in which the leading cases were reviewed and analyzed, Judge Cooper held that the conveyance, which was "of our entire stock of goods, * * * now in our store, * * * and any other goods which may, during the existence of this mortgage, be purchased by the grantors and put into the store," being of that class where "a mortgage lien is sought to be created on personal goods, the only profitable use of which is as articles of commerce, and an unlimited power of disposition is reserved, was invalid at law and not enforceable in equity," "upon

Bank of Rome *v.* Haselton.

the ground that such a transaction, irrespective of fraud, is *against public policy,* throwing open too wide a door for possible fraud."

By the deed in the present case the legal title to the goods and chattels is put in Montague; but he is not to take possession for thirty days.; nor is the possession to be given to another; the debtors are to keep the goods; and, since there is nothing to forbid it, they may use them. The only profitable use of a stock of goods in a store is to sell them. The debtors made this use of them evidently with the knowledge of the creditor and the trustee, neither of whom forbade it. It is obvious that it was intended by Montague and manager Stone, that the debtors should so use the goods; though the power of sale is not expressly contracted for, it is plainly implied; and the deed was so construed and acted upon by the parties, and was thus as efficient for advantage to the debtor and injury to the other creditors, as though the right had been expressly contracted for.

Though the parties may have been honest in their intentions, it is obvious that at the time of making this mortgage, it was understood between the parties to it that the mortgagor should retain possession of the goods and keep open the store and retail the same after the mortgage just as before. It is this intention to allow the mortgagor the right of disposition, whether that intention appear on the face of the deed, or by express oral declaration of the mortgagee, or is inferred from the relation and conduct of the parties, which, in the opinion of the majority of the court (Judges Free-

man and Cooper dissenting), stamps the mortgage as void: Pierce on Mortgages of Merchandise, ch. III. And being void as to the merchandise, it is settled by our decisions to be void as to all the property embraced in the mortgage: *Simpson* v. *Mitchell*, 8 Yer., 419; *Richmond* v. *Crudup*, Meigs, 581; *Trabue* v. *Willis*, *Id.*, 584.

Besides, it is doubtful whether the mortgagee could maintain its lien in this case because of its equivocal language and conduct, as a result of which the mort-gaged property was seized by the sheriff under the general creditors' bill, to which the mortgagee was the most active and the principal party. It is prob-able that its failure to refer to its mortgage of this property and thus exclude it from the general prayer for an attachment to be levied on "all the property of the Vulcan Works, * * * and all other property and estate belonging to said Haselton & Harrison," would be regarded as a waiver of its mortgage lien under such a bill as this.

It results that the mortgaged property, will go with the other property attached for the just benefit of the general creditors, and among their claims will be in-cluded the mortgage debt which is set up by petition in the leading case.

Fourth. Next in order and first in importance and difficulty, is the question of the validity and sufficiency of the warehouse receipts to hold the bar iron, nails and spikes against the claims of attaching creditors.

This is somewhat simplified by noting *in limine*, that Lowe is reported by the Referees to be a ware-

houseman, and the receipt holders to be *bona fide* holders for value, and, there being no exception on these points, they must be taken as conceded.

The objections of the attaching creditors to the warehouse act of 1879, that it violates Section 17, Article 2, of the Constitution, are not well taken. Its title is: "An act to define warehousemen, to regulate their duties, and to affix penalties for the violation thereof, and relating to their receipts." It does not "embrace more than one subject," and that is plainly "expressed in the title": *Monell* v. *Fickle,* 3 Lea, 79. It does "repeal a former law," and to make the repeal effectual and constitutional, it "recites in its caption, *or otherwise,* the *title* or substance of the law repealed," as follows:

"Sec. 8. Be it further enacted, that chapter 94 of the public acts of 1875, entitled, an act to define the rights and duties, and regulate the liabilities of warehousemen and factors, be, and the same is hereby repealed."

This recital of the title of the act repealed in the body of the repealing act is sufficient: *State* v. *Gaines,* 1 Lea, 735.

This act provides that any person who shall receive in store for hire, or undertake to receive, take care of and sell for other persons "any description of personal property," shall be a warehouseman; that no receipt shall be issued for the property unless it shall be at the time of issuing the same in the custody and under the control of the warehouseman and in store, or upon the premises; that he shall retain the

custody and control of the property covered by re-
ceipt until the receipt for the same be surrendered
and cancelled ; that warehouse receipts shall be nego-
tiable by written endorsement and delivery, as bills of
exchange and promissory notes, and the *bona fide*
holder thereof shall be deemed and taken to be the
absolute owner of the personal property therein specified.

Under this act Lowe, as hereinbefore stated, received
from Haselton & Harrison into his custody and control
as warehouseman, large quantities of bar iron, spikes
and nails, stored the same for hire in the warehouses
and on the premises of Haselton & Harrison (adjacent
to their mill and works), occupied by him for that
purpose, and, as fast as received, gave them receipts.
of which the following is a sample:

S. B. LOWE,
PIG-IRON, STORAGE AND COMMISSION.

APRIL 30, 1880.
I hereby acknowledge to have received from Haselton & Harrison this
day, and will deliver free on board car at my yard to ———————— or
order, only on the surrender of this certificate and the payment of all
charges thereon, 50,000 pounds bar iron. This iron is represented to
have been made at Vulcan Works, located in Hamilton county, State of
Tennessee, and classified as follows: Assorted; but no responsibility is
assumed except as to weight.
Charges as usual.                    S. B. LOWE, *Proprietor.*

These receipts Haselton & Harrison, by their man-
ager, Stone, endorsed and delivered to various parties
as collateral security for loans or for pre-existing debts,
and the iron, nails and spikes in store with Lowe at
the filing of the bill, did not greatly exceed the
amounts covered by these receipts. Such surplus Lowe
claimed, to pay warehouse and factorage charges and

repay advancements made by him to Haselton & Harrison, and replevied all the iron, nails and spikes taken out of his custody under the attachment, giving the warehouse receipt holders as sureties on his bond for $17,000, the amount of attachment debts levied on said warehouse property, and the agreed value of the same. The contention for the property, therefore, is solely between the attaching creditors on the one side, and the warehouseman and receipt holders jointly on the other; and the report and exceptions thereto open for decision all questions embraced in the controversy, except the character of Lowe's possession and the *bona fides* of the receipt holders.

What, then, under our warehouse statutes, are the rights of these *bona fide* creditors holding receipts of a warehouseman to the goods in the custody of the warehouseman attached by other creditors? By the terms of the act, such receipt holders are absolute owners "of the * * * personal property therein specified;" and under this act they claim all the property in Lowe's custody seized under the attachments. The attaching creditors resist this claim upon grounds now separately to be examined.

1. They say the property attached was not described or specified in the receipt.

2. If it was, it had never been in possession of Lowe, but was always in that of Haselton & Harrison, the debtors.

3. If the property described in the receipts had ever been in Lowe's possession, it had been so exchanged by loans, sales and substitution as no longer

16—VOL. 15.

to be susceptible of identification; and this being done by the warehouseman as agent of the receipt holders, whether with or without their knowledge or express authority, they must bear the loss consequent upon his conduct of the business.

1. The property is " specified" in the receipt as 50,-000 pounds· assorted bar iron, made at the Vulcan Works in Hamilton county, Tennessee, and received by Lowe. The iron was all deposited in bulk—the only separation being into sorts and sizes, and it is not pretended that the particular iron for which any receipt was given could have been identified by this description, or indeed in any other manner. Delivery according to the promise made in the receipt, could only have been made to the holder thereof out of the bulk of iron in the warehouse, as it was there racked up according to sorts and sizes.

The receipts for the nails, spikes and pig-iron are no more definite, and the identification there also was impossible. Therefore the attaching creditors insist and the Referees report, that the receipts are so vague and indefinite that no· title passed to the holders, the argument being that a warehouse receipt must so particularly describe the property as to enable the holder to maintain trover or replevin for it, else it will not pass title; while for the receipt holders it is contended, that no such description or identification is necessary, inasmuch as this rigorous rule of the common law has been modified to meet the necessities of modern commerce for warehousing and storage, so as to facilitate the pledging and sale of property stored

in the capacious warehouses and gigantic elevators now used in this country.

It is doubtless true that such modification has been introduced by the court in accordance with the usages and necessities of trade: Jones on Pledges, sec. 317, and cases there cited. And in regard to such property as grain this may be regarded as the settled law of the land. Indeed, so much is this practice favored that in the case of *Bank* v. *Hibbard*, 48 Mich., 118, (opinion by Judge Cooley), it was held that "a warehouseman, having in store wheat of his own, may effectually pledge part of it to secure his own debt by his warehouse receipt, and without separating the wheat from the mass." The effect of this is that the holders of the warehouse receipts are tenants-in-common of the mass. "But," says Mr. Jones, *Id.*, 318, "this exception to the general rule embraces only such property as grain, which is customarily stored in bulk, or other goods, the constituent particles of which are alike and not distinguishable." And he cites *Gardiner* v. *Suydam*, 7 N. Y., 357, for authority that it does not extend to flour in barrels, even though of the same brand and quality and of uniform value; and *Ferguson* v. *Bank*, 14 Bush, (Ky.), 555, to exclude such property as hams, and *Stewart* v. *Phœnix Insurance Company*, 9 Lea, 104, to exclude bales of cotton from the operation of this liberal rule of modern commercial law.

*Gardiner* v. *Suydam* arose in 1844 between the holder of a warehouse receipt for money advanced on flour deposited to be forwarded in the opening of

canal navigation and a purchaser of a part of the flour in the warehouse at that time, and is properly digested as follows: "Where a warehouseman receiving flour for shipment gives receipts from time to time for the quantity in store not previously receipted to be delivered to the owner's factor, upon which the factor accepts the owner's drafts, no ⸢title to the flour receipted passes unless it was actually separated from the mass by a delivery, or by some mark or designation by which it could be specifically known.

"*The effect of the receipt in such a case is to give the factor a right to demand from the receiptor the delivery of the flour.*"

We have not access to the Kentucky case to know the exact question decided.

In the Tennessee case the contention was between the warehouseman and the holders of a receipt for "forty bales of cotton with various marks," received of A. J. Vaughan & Co., and the points ruled were: First, that a warehouse receipt is a written contract not variable by parol testimony; and second, that the warehouseman is estopped as against the receipt holder to deny the possession of the articles mentioned in the receipt, the court expressly declining to make any ruling on the sufficiency of parol identification of the particular cotton embraced in the receipt.

We do not regard this case as settling in our State the extent of the exception to the old rule of description in warehouse receipts, and certainly cannot say from it that a portion of such articles as bales of cotton, kegs of spikes or nails, pig-iron and bar-

Bank of Rome *v.* Haselton.

iron in bulk, with other articles of the same kind, may not be sold and title passed without their actual separation from the rest, or their being so described in the receipt as to be susceptible of exact identification. Indeed, in the case of bar-iron and pig-iron, kegs of spikes and of nails, no good reason appears for refusing to the owner the same facilities of commerce and trade that are allowed to grain dealers.

However the case might be, if the question were between a receipt holder and a purchaser, as in *Gardiner* v. *Suydam,* in this case, since the contention is between the warehouseman and receipt holders claiming in common on the one side, and the attaching creditors on the other, and since the creditors as against *bona fide* receipt holders, can have no higher right than the debtors, and the warehouseman is estopped from denying the possession of the articles mentioned in his receipts, and the debtors had delivered them to him, and passed the receipts for them to the present holders for value, and so could not reclaim the property, we hold that notwithstanding the vagueness of the description contained in the receipts, they are sufficient to enable the receipt holders to claim the iron they represent which was in the hands of Lowe as warehouseman.

To hold otherwise would be to make him personally liable to the receipt holders for the amount of their advances, and at the same time take out of his possession the very property on account of which the liability was assumed, and turn it over to other creditors. This would be little short of judicial rob-

bery, and would operate to suppress the business of warehousing in our State. The validity of a pledge, and the right that accompanies possession, would be entirely disregarded in such a decision.

2. But it is said the property was not in the possession of Lowe, but of the pledgeors, Haselton & Harrison, and therefore the warehouseman gave the receipts in violation of law, and must himself take the consequences.

It is true that the warehouse and yard, where the property was kept, were at the Vulcan Iron Works, and it was not generally known that Lowe was using them; but it was commonly supposed that all the [iron, nails, etc., there were the property of Haselton & Harrison; and the failure of Lowe to pay rent for the warehouse, or to make known his occupancy of it by some sign or token, casts suspicion upon the dealings between him and the manufacturers, and gives color to the charges of fraud and collusion made by the attaching creditors, though it nowhere appears that the fact of Lowe's possession was actually concealed, or the fact of the pledge of the property denied, either by Lowe or manager Stone, or any one for them, and that any party inquiring was misled or deceived thereby. But it is too plainly proven to admit of doubt that whatever were the appearances or the suppositions of workmen or creditors as to the possession of the property in dispute, it had been actually delivered to and received by Lowe, who had a clerk there at the warehouse and yard taking care of the property, who carried the keys of the doors,

and without whose permission or consent the pledged property was not interfered with. In short, the actual possession was in Lowe; the property was in the warehouse or on the yard when the receipts were given, and they are not invalid for the ·want of possession by the warehouseman and consequent authority to issue them. Placing goods in a cellar of the warehouse of the pledgeor, hired for the purpose by the pledgee, has been held a sufficient delivery: *Sharp* v. *Philadelphia Warehouse Company*, 9 Rep., 572.

The evidence of separate possession and custody is much stronger in the present case. In the Michigan case above cited, and in other cases, the right of a warehouseman to issue receipts for his own property in store, has been sustained, and the title held to pass thereby, as against all parties, to the receipt holders; and that too without registration of the receipt. But the present case does not require us to carry the doctrine to that extent. It is sufficient that the property was in the possession of the warehouseman as that of the pledgeor; the receipt holders have therefore a right to it.

Third. It is insisted that Lowe's manner of dealing with the pledged property has deprived the receipt holders and himself of any claim to the property; and that as the mortgage of merchandise was void for want of possession of and mode of dealing with the property, so also are the warehouse receipts for the same reason and upon the same authority.

This argument ignores the fundamental difference

between a mortgage and a pledge, and the still more important difference in fact, that while the stock of goods mortgaged remained in the possession of the debtors, the iron and nails pledged were in the possession, not of the debtors, but of the warehouseman; and its conclusions cannot therefore be accepted. Yet the question remains: What was the effect of Lowe's permitting manager Stone to take out of the warehouse and yard lots of iron and nails to fill special orders on promise · to return a like amount in quantity and value as soon as made, which promise seems to have been observed and kept by him? Did that release all the iron from the receipts, or, in other words, deprive the receipt holders of their title to all the iron, nails, etc., in the warehouse? This can hardly be asserted with seriousness. But it is urged with force that as the iron allowed to be taken out was the property of the receipt holders, they must look to that for their indemnity; and that substituted was not embraced in the receipts, some indeed being placed in store after the giving of the last receipt, and hence the receipt holders have no claim to it, and the attaching creditors may hold it; and if it cannot be separated from that covered by the receipts, then they may take it all, and Lowe must be the loser for mixing it. How this might be as between receipt holders and purchasers, here again we need not determine; nor what would be the rights of the parties if the promised substitute property had been seized before delivery to Lowe. · The question is: Who has the superior right to this sub-

stituted iron, the receipt holders or the creditors attaching after it went into the custody of the warehouseman?

We think it plain the right is in the receipt holders: Colbrooke on Coll. Sec., sec. 420. By force of the statute the title to the property represented by these receipts was in them. The transaction by Lowe was in effect a loan of the iron. It was without the authority of the receipt holders, and if the loan had not been repaid they could have looked to Lowe for the value of the iron. It was returned by manager Stone and by Lowe replaced in lieu of that borrowed, and so was in his actual custody. This inured to the benefit of the receipt holders, and they have the right to ratify and adopt this unauthorized act of Lowe. They have exercised this right. And since no right of another party had intervened between the loan and the return of the iron, the receipts must be held to cover and protect the substituted iron as they did that for which the substitute was given. This, of course, would not include the property which was placed in the possession of Lowe without his knowledge or consent on the night before the levy, and which he refuses to make any claim to. This the attaching creditors have secured by their levy.

Fifth. The objection that the receipts were not registered can avail nothing. Such papers do not require registration. Possession by the pledgee or warehouseman is sufficient, and is a substitute for registration: *Crisp* v. *Miller*, 5 Heis., 697.

Sixth. Nor do we see that any of the receipt

holders, as insisted, have taken such steps in the proceeding as to waive or abandon their rights in the premises within the rules recognized by our decisions, which require an exhibition of a definite intention to abandon a right before the same will be decreed (*Masson* v. *Anderson*, 3 Bax., 304), and allow a pledgee a choice as to the method of enforcing his right: *Arendale* v. *Morgan*, 5 Sneed, 716.

Seventh. The Referees report the transactions between Lowe and manager Stone to be, if not fraudulent in fact, at least of so questionable a nature as to repel Lowe from any benefit thereunder; and so these transactions seem to us. And if Lowe were here seeking the active aid of a court of equity, we might hesitate to grant him aid or relief. But that is not the case. He stands here as a defendant in possession maintaining his legal rights. The property had been placed in his custody as warehouseman. He had incurred expenses and made advances upon it on the faith of the actual possession. It matters not, that no written evidence of the transfer was given, nor even that an inventory was not kept of the property. These have been held non-essential to the validity of such a transaction: *Hurst, Purnell & Co.* v. *Jones*, 10 Lea, 8.

He relies upon his possession and resists the efforts of the attaching creditors to take custody of the property until the debts of the receipt holders and his own are paid, and alleges that the pledged property is not of value sufficient for these purposes.

Lowe's defense seems impregnable. His conduct

may have been suspicious.   He may have favored these failing debtors and allowed them unusual privileges, whereby they were enabled to float along after they had reached the point of insolvency; and thus others may have been led to trust them when they were not solvent.   But he did not guarantee their solvency, nor did he make false representations to any of the attaching creditors whereby they might hold him liable for their losses, or be estopped to claim the property in his possession.   And we know of no power in a court of equity to decree a forfeiture of title to property in possession because merely of the suspicious conduct of the possessor.   The law gave Lowe the right to hold enough of the property in his custody as warehouse-man to indemnify himself against all valid claims of holders of his warehouse receipts; to reimburse him for expenses incurred and advances made on the faith of the property stored with him; and also to pay his warehouse charges and his compensation for services as factor; for such was the contract of bailment.   His account, fully stated and filed under oath, has not been successfully impeached in any of its items, and we must therefore take it for correct, and allow him to retain the property for it, as well as the receipt holders.

Eighth.   It is argued for the attaching creditors that they have a prior right to the proceeds of the debts of the Alabama & Great Southern Railway over Lowe, who claims them by assignments made respectively May 25 and 26, while the attachment was levied June 1, 1880.

This claim for priority is based upon the assertion,

first, that Stone was not manager at the date of the assignment, and had no authority to make it; and second, that notice of the assignment had not been given to the debtor and the same perfected at the date of the attachment levy.

The proof does not sustain either assertion. Stone's general authority as manager had not terminated when the assignments were made. And although notice of the assignment did not reach the office of the secretary of the company until June 4, three days after the attachment, it was duly given to the resident purchasing agent, who made the debts on the 26th of May, five days before the attachment was levied. We are of opinion that notice to this purchasing agent was notice to the company, and the assignment thus perfected before the levy of attachment fixed a priority of right in the assignee over the claim of the attaching creditors.

The result on the whole case is, that the report of the Referees is set aside, and the decree of the chancellor affirmed with the modifications rendered necessary to conform it to this opinion.

The proceeds of all the property seized under the various attachments sued out by parties to the general creditors' bill, saving of course that in Lowe's custody, will be *pro rated* among all the creditors who are parties to the bill, and upon all their valid debts presented therein, whether due or not, without preference to any of them, either because of their asserted liens as workmen or as holding separate attachments under the general creditors' bill.

Bank of Rome v. Haselton.

The bills of those parties impeaching the general creditors' bill and the proceedings thereunder, will, in that aspect, be dismissed; but they will be allowed recoveries against the debtors; and wherever they have by attachment obtained liens upon any of the debtors' property other than that in the custody of Lowe, or that seized under previous attachments, they may, by decree, subject the same to the satisfaction of their recoveries; or if already sold, they are entitled to the proceeds thereof.

The costs of this court will be paid in equal parts by the appellants and their sureties, that is one-fifth each, by the complainants in the following bills: Ward & Hamill and others, No. 2480; C. A. Moross and others, No. 2482; Wason Car and Foundry Co. and others, No. 2484; W. G. Lewis and others, No. 2486; Crutchfield & Co., No. 2489.

The costs of the general creditors' bill in the chancery court should be paid entirely out of the fund in that case; and if any thing yet remains of this fund, after paying the costs and claims in that cause, the same will be paid on the claims of the other creditors in the order of their attachments levied on the property producing this fund. The other costs of the chancery court will also be paid as decreed by the chancellor.

The cause will be remanded to the chancery court for the execution of the decree in accordance with this opinion.